D. Maimon Kirschenbaum
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
VLADIMIR DOBROSMYLOV,

        **Plaintiff,**

   v.

**DESALES MEDIA GROUP, INC., the ROMAN CATHOLIC DIOCESE OF BROOKLYN, and MONSIGNOR KIERAN HARRINGTON,**

        **Defendants.**
---------------------------------------------------------x

**COMPLAINT**

**CASE NO.:**

Plaintiff Vladimir Dobrosmylov alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") and 42 U.S. Code § 1981 (Section 1981). This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

1

## PARTIES

3. All Defendants are hereinafter collectively referred to as "Defendants."

4. Defendant DeSales Media Group, Inc. ("Defendant DMG") is the communications and technology arm of the Diocese of Brooklyn. Defendant DMG publishes news and information with a Catholic point of view. Defendant DMG was formerly known as Trans Video Communications, Inc. until October of 2011.

5. The Brooklyn Diocese is a religious organization with offices located at 310 Prospect Park West, Brooklyn, New York 11215. Upon information and belief, the Brooklyn Diocese is the fifth largest diocese the United States and is incorporated and duly organized under the laws of the State ofNew York.

6. Defendant Monsignor Kieran Harrington ("Defendant Harrington") is the Vicar for Communications for the Diocese of Brooklyn and Chairman of Defendant DMG.

7. Plaintiff Vladimir Dobrosmylov ("Plaintiff" or "Plaintiff Dobrosmylov") was employed by Defendants as a video editor for over 20 years until he was terminated on October 19, 2018.

## FACTS

### Wage and Hour Allegations

8. Defendants committed the acts alleged in this Complaint knowingly, intentionally and willfully.

9. Plaintiff Dobrosmylov was hired in or about 1997 by Defendant DMG (known at the time as Trans Video Communications, Inc.) as a video editor. At that time Defendants paid Plaintiff $13 per hour.

10. Plaintiff received incremental wage increases over the years and by 2008 Plaintiff was making approximately $76,000 annually.

11. In or about January of 2008, Defendants promoted Plaintiff Dobrosmylov to Post Production Supervisor for Defendant DMG. Plaintiff did not receive a raise along with these greater responsibilities.

12. In the role of Post Production Supervisor, Defendants paid Plaintiff $76,000 annually as an exempt employee.

13. In the Post Production Supervisor role, Plaintiff Dobrosmylov supervised five employees who were working for Defendants' new television station NET TV. Rather than doing video editing himself, he was supervising other video editors who were working on Defendants' television station.

14. Just a few months later, in or about April of 2008, Defendants reassigned Plaintiff Dobrosmylov to work exclusively on a particular news program recently launched on NET TV called Currents. Defendants did not change Plaintiff's official title, pay structure or exempt status in connection with this demotion.

15. In this new role, Plaintiff returned to serving as a video editor with no supervisory responsibilities.

16. As Post Production Supervisor, Plaintiff had been included in meetings with other decision-making supervisors. Once Plaintiff was reassigned to video editor of Currents, Defendants no longer included Plaintiff in such meetings.

17. In Plaintiff's role as a video editor for Currents, Plaintiff did not supervise any employees. Plaintiff was responsible for editing news clips purchased by Defendants from syndicated content. Plaintiff pieced together these pre-recorded news clips to create Defendants'

news program. Further, all of the text Plaintiff used for the graphics he created for Currents came directly from Defendants' Chief News Editor, Howard Doyle. Plaintiff would simply cut and paste the text he received into the graphics as necessary.

18. During the years that followed Plaintiff's demotion to video editor until 2017, he worked from 8:30 a.m. to 5:30 p.m. or 6:30 p.m. Monday through Friday. Plaintiff took only 20 to 25 minutes off for lunch each day.

19. In addition, at least six to eight times per year, Plaintiff was required to come to work in the evenings and on weekends to cover special events or holiday mass for the news program.

20. Until 2017, Plaintiff worked between 43.5 and 48.5 hours per week, and rarely missed a day of work.

21. In or about 2017, Defendants hired Vito Formica as the Executive Director of News Content and Development. Mr. Formica became Plaintiff's supervisor and also hired Linda Ludeke as Chief Production Manager to oversee Plaintiff Dobrosmylov's work.

22. Mr. Formica instituted much more rigorous working hours for Plaintiff. Under Mr. Formica's supervision, Plaintiff was required to work from 8:30 a.m. to 7:30 p.m. every weekday. In addition to the 55 or more hours Plaintiff was required to work during the weekdays, he was also expected to come to work on some weekends and evenings to cover special events or holidays.

23. Mr. Formica, strictly enforced Plaintiff's hourly schedule. In fact, in or about September of 2018, Plaintiff Dobrosmylov had a family situation that required him to leave work slightly before 5 p.m. Plaintiff ensured that his duties were covered and then left work to address his family's needs. When Mr. Formica discovered that Plaintiff had left work early, he called Plaintiff and insisted that Plaintiff return to work. Plaintiff did, in fact, return to work that evening.

24. When Plaintiff told Mr. Formica that he desperately needed more time for his family, Mr. Formica invited Plaintiff to resign at any time.

25. Defendants tracked Plaintiff's hours worked with the TimeForce timekeeping system.

26. Mr. Formica also instructed Plaintiff that he could no longer take a lunch break during the day.

27. On June 11, 2018, Plaintiff complained to Defendants regarding his inability to take a much-needed lunch break during his long days. Ms. Ludeke responded to Plaintiff by email stating "this is not how it works for *us* as salaried employees." Ms. Ludeke, the Chief Production Manager, referred to herself, Deanna Scanlon – Defendant DMG's Director of Human Resources, and Plaintiff – a video editor, in that category of exempt employees. Ms. Ludeke explained that Plaintiff is a salaried and exempt employee who does not have set hours and does not get official lunch breaks.

28. Plaintiff was clearly a non-exempt employee covered by the FLSA while working as a video editor on Defendants' news program for the past 11 years.

29. Despite being well-aware of Plaintiff's many overtime hours, Defendants never paid Plaintiff an overtime wage for the hours he worked over 40 in a workweek.

30. Defendants knew that nonpayment of the overtime premium would economically injure Plaintiff and violated federal and state laws.

31. Defendants also failed to provide Plaintiff with accurate wage statements indicating his hours worked and rate of pay.

## Discrimination Allegations

32. Plaintiff is Jewish and is the only non-Catholic employee employed by Defendant DMG.

33. In 2012, Plaintiff's mother passed away. Plaintiff was asked by Defendants to create a short obituary honoring his mother's life. Plaintiff created a tribute to his mother that highlighted the fact that she valued her Jewish heritage and was a survivor of the Holocaust.

34. That same year, Msgr. Kieran Harrington, Vicar for Communications for the Diocese of Brooklyn and Chairman of Defendant DMG, announced to a group of Defendants' employees, including Plaintiff, that because Defendant DMG is a Catholic organization, it has the right to hire only Catholic employees. As the only non-Catholic in the company, Plaintiff felt directly threatened by this announcement.

35. In or about 2016, Msgr. Harrington asked Plaintiff when he would be "accepting the Lord Jesus Christ as his savior."

36. Beginning in or about 2016, for special religious holiday events that were recorded in the evenings or weekends, Defendants would require Plaintiff Dobrosmylov – the Jew- to handle the assembly of an entire show covering the event on his own. Plaintiff's Catholic colleagues were given a break while Plaintiff had to work many overtime hours. When Plaintiff inquired occasionally regarding why he was singled out for this intense workload, Chief News Editor Howard Doyle jokingly responded, "Because you're the best, Vlad, you're the best."

37. Mr. Doyle also required that Plaintiff Dobrosmylov download and incorporate into Currents content that Defendants had not licensed. When Plaintiff protested the illegal practice that could tarnish his employer's integrity, Mr. Doyle insisted that Plaintiff, "just get it done."

38.     Despite Defendants' clear preference for Catholic employees, Plaintiff received positive reviews throughout his two decades of employment with Defendants. In fact, Mr. Doyle rated Plaintiff Excellent and Good in nearly every category on the assessment.

39.     However, in or about 2017, Defendants hired a new management team, including Mr. Formica, William Maier as Chief Operating Officer, and Linda Ludeke. At this point, Defendants began to perpetrate and condone more obvious discrimination against Plaintiff Dobrosmylov.

40.     For example, in 2018, after 20 years of receiving positive reviews, Plaintiff received his first negative review from Ms. Ludeke. In Plaintiff's 2017 and 2016 reviews, as well as all previous reviews, Plaintiff received ratings of "good" and "excellent." In 2018, Ms. Ludeke rated Plaintiff as "poor" or "fair" in nearly every category.

41.     Defendants also began criticizing Plaintiff based on trumped up accusations for no apparent reason. For example, upon returning from a scheduled vacation on or about August 13, 2018, Ms. Ludeke accused Plaintiff of "unlawfully" taking his MacBook Pro laptop to his home during his vacation. In actuality, upon receiving the higher end computer needed for his editing work, Defendants required Plaintiff to sign a contract stating that Plaintiff is personally responsible for the laptop. Thus, prior to leaving for his vacation, Plaintiff requested Ms. Ludeke's permission to take his laptop computer to his home so it would not be left at work unattended. Ms. Ludeke granted Plaintiff permission to do this. However, when Plaintiff returned to work with the computer, Ms. Ludeke essentially accused Plaintiff of stealing the computer. She wrote about the incident in his performance review and questioned his honesty – after over 20 years of service to the company.

42. Mr. Formica was also particularly demanding of Plaintiff. As described above, Plaintiff was working a minimum of 55 hours per week under Mr. Formica. When Plaintiff begged to have a bit of time off for his family, Mr. Formica encouraged Plaintiff to leave the company completely.

43. In 2017, Plaintiff celebrated his 20th year of employment with Defendants. It is Defendants' regular practice with its Catholic employees to acknowledge this milestone and dedication with a celebration honoring the veteran employee in front of his or her colleagues. By contrast, in "honor" of Plaintiff Dobrosmylov's 20th year of employment, Defendants called Plaintiff to a meeting with a representative from human resources and Chief News Editor Howard Doyle. Mr. Doyle and the human resources representative congratulated Plaintiff on his 20 years of service and sent him back to work.

44. Mr. Formica also changed Plaintiff's title back to Video Editor, which had remained officially and inaccurately Visual Development & Post Production for years, despite his actual demotion to Video Editor in 2008.

45. Finally, after the harassing and discriminatory treatment began to take a toll on Plaintiff's mental and physical health, as well as on his family life, Plaintiff Dobrosmylov appealed to Msgr. Harrington and Arthur Digman, Defendant DMG's Chief Executive Officer for help. Plaintiff begged to be transferred out of Mr. Formica's department so he could continue to serve the company free from harassment. Plaintiff attempted to speak with Mr. Digman and Msgr. Harrington five or six times, but both men consistently and quite obviously avoided addressing Plaintiff or his complaints.

46. Instead of agreeing to meet with Plaintiff, after over two decades of service, Defendants' fired Plaintiff Dobrosmylov.

47. When Defendants finally rid themselves of their sole Jewish employee on October 19, 2018, Plaintiff attempted to contact Msgr. Harrington one last time to request reassignment rather than termination. Msgr. Harrington told Plaintiff to come back in one week for a meeting with him. When Plaintiff returned one week later, Msgr. Harrington did not show up for the scheduled meeting.

**FIRST CLAIM FOR RELIEF**
**(FLSA Overtime Violations, 29 U.S.C. §§ 201 *et seq.*)**

48. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

49. Throughout the statute of limitations period covered by these claims, Plaintiff regularly worked in excess of forty (40) hours per workweek.

50. At all relevant times, Defendants had operated under a decision, policy and plan of willfully failing and refusing to pay Plaintiff at one- and one-half times his regular hourly rate for work in excess of forty (40) hours per workweek even though Plaintiff had been entitled to overtime.

51. Plaintiff seeks damages in the amount of his unpaid overtime compensation, liquidated (double) damages as provided by the FLSA for overtime violations, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**(New York State Overtime Violations, N.Y. Lab. L.**
**N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.4)**

52. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

53. It is unlawful under New York law for an employer to suffer or permit a non-exempt employee to work without paying overtime wages for all hours worked in excess of forty (40) hours in any workweek.

54. Defendants willfully, regularly and repeatedly failed to pay Plaintiff at the required overtime rate of one-and-one-half times his regular rate for hours worked in excess of forty (40) hours per workweek.

55. As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

### THIRD CLAIM FOR RELIEF
(Section 1981- Discrimination)

56. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

57. In violation of Section 1981, Defendants intentionally and willfully discriminated against Plaintiff on the basis of his race.

58. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

59. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

60. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical

injuries, and medical treatment, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**(New York Wage Statement Requirements, N.Y. Lab. L. §§ 195, 198)**

61. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

62. Defendants did not provide Plaintiff with the proper and accurate wage statements required by N.Y. Lab. Law § 195.

63. As a result of Defendants' unlawful conduct, Plaintiff is entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

**FIFTH CLAIM FOR RELIEF**
**(New York State Human Rights Law – N.Y. Exec. Law § 296(1) –**
**Religious Discrimination)**

64. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

65. In violation of NYSHRL, Defendants intentionally discriminated against Plaintiff on the basis of his religion.

66. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

67. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

68. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**
**(New York City Human Rights Law ("NYCHRL")**
**N.Y. Admin. Code §§ 8-101 *et seq.* – Religious Discrimination)**

69. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

70. A copy of this Complaint will be delivered to the New York City Corporation Counsel.

71. In violation of the NYCHRL, Defendants discriminated against Plaintiff on the basis of his religion.

72. As a direct and proximate result of Defendants' discrimination against Plaintiff, he has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

73. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

74. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

75. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and

medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
(New York State Human Rights Law – N.Y. Exec. Law § 296(6) –
Aiding and Abetting Discrimination)

76. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

77. In violation of the NYSHRL, Defendants aided and abetted discrimination against Plaintiff on the basis of his religion.

78. As a direct and proximate result of Defendants' aiding and abetting discrimination against Plaintiff, he has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

79. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

80. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

81. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. An award of damages, according to proof, including liquidated damages, to be paid by Defendants;

B. Penalties available under applicable laws;

C. An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, liquidated damages, and punitive damages, to be paid by Defendants;

D. Costs of action incurred herein, including expert fees;

E. Attorneys' fees, including fees pursuant to 29 U.S.C. § 216, N.Y. Lab. L. § 663 and other applicable statutes;

F. Pre-judgment and post-judgment interest, as provided by law; and

G. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: New York, New York
       September 9, 2019

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By:
*/s/ D. Maimon Kirschenbaum*
D. Maimon Kirschenbaum
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*