```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                              :
    VLADIMIR DOBROSMYLOV,                                     :
                                                              :
                                    Plaintiff,                :   MEMORANDUM DECISION
                                                              :   AND ORDER
                    - against -                               :
                                                              :   19-cv-5122 (BMC)
                                                              :
    DESALES MEDIA GROUP, INC. and THE                         :
    ROMAN CATHOLIC DIOCESE OF                                 :
    BROOKLYN,                                                 :
                                                              :
                                    Defendants.               :
                                                              :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff Vladimir Dobrosmylov has sued DeSales Media Group, Inc., and the Roman Catholic Diocese of Brooklyn, alleging that they violated the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") by failing to pay overtime compensation. Before me are the parties' motions for summary judgment. Both defendants argue that plaintiff's work as a Lead Video Editor and Graphic Artist falls within the statutory exemption for "creative professionals." Separately, the Diocese argues in the alternative that even if plaintiff was a non-exempt employee, the Diocese was not his employer. Plaintiff has moved for partial summary judgment on both issues.

I conclude that DeSales, but not the Diocese, is potentially liable for failing to provide overtime compensation under the FLSA and NYLL. Although the undisputed facts show that plaintiff's work does not fall under the "creative professionals" exemption, plaintiff has not established that the Diocese was his employer. Therefore, DeSales's motion is denied, the Diocese's motion is granted, and plaintiff's motions are granted in part and denied in part.

## BACKGROUND

DeSales is a non-profit corporation that publishes news "with a Catholic point of view." It enjoys a close relationship with the Diocese, as the Bishop appoints its officers and members of the board. Nevertheless, DeSales remains a separate entity, with its own separate group of employees. Plaintiff was one of those employees for over 20 years.[1]

Over the course of that employment, plaintiff worked in various positions, most recently as a Lead Video Editor and Graphic Artist. He spent between 30 and 40 percent of his time "downloading videos, filling out forms, and keeping track of things." The parties agree that these tasks did not involve creativity, but they dispute whether the remaining tasks are those of a creative professional.

The bulk of this remaining time involved editing videos and creating graphics for "Currents," a nightly newscast focused on the Catholic church. Plaintiff was involved in the pre-production, production, and post-production stages. For pre-production, plaintiff received a "rundown" from the executive producer. It outlined the stories that would appear in the program, the order in which they would appear, and the treatment they would receive. It also explained where and when to insert graphics, soundbites, and other pre-recorded segments, complete with links to the images, videos, and soundbites that plaintiff needed. Plaintiff downloaded the video files, put them in video editing software, and then edited them according to the directions he received from the executive producer. He also created the graphics that appeared on the show. Then, at the production stage, plaintiff observed the reporters recording the newscast, tracking any corrections to make during the editing. Because the show "never was recorded smoothly," plaintiff explained, "there w[ere] a lot of gaps, lots of corrections,

---

[1] Plaintiff spent part of this time at DeSales's predecessor.

corrections in the script, [and] corrections in the video" that he had to track. Finally, during post-production, plaintiff fixed those errors and "assembled" the 25-minute newscast. Once plaintiff prepared a tape for the TV broadcast, he took the file, made it compatible for an internet upload, and placed it on YouTube and the Currents website.[2]

In addition to editing videos and creating graphics, plaintiff ensured that Currents met DeSales's production standards. This task required plaintiff to refer to a "style guide" he helped create, which ensured that Currents had a consistent look and feel. For example, if a reporter shot a vertically oriented video on a phone, plaintiff placed "wings" onto the video, inserting a graphical background so that the video occupied the entire frame for the horizontally oriented show. Alternatively, if Currents licensed content from another broadcaster like CNN, plaintiff removed the CNN logo and conformed the graphics to the Currents style. In many cases, plaintiff also selected the best shots for the newscast, though the executive producer set the guidelines. If plaintiff found something beneficial that the executive producer had overlooked, plaintiff could check with the producer to see if he could add that element to the video. This work, the parties explain, ensured that Currents had a "consistent look and feel."

Besides working on Currents, plaintiff edited videos and created graphics for a weekly promotion for "Tablet," DeSales's newspaper. The promotions appeared on Currents and lasted

---

[2] Although DeSales states that plaintiff's description of the rundown is "[d]isputed as unsupported by the totality of the record," the dispute is somewhat illusory. Specifically, DeSales stresses that plaintiff's superiors originally provided the rundown via email, but DeSales's executive director of news content and development, Vito Formica, testified in his deposition that email was "a very archaic way of putting together a rundown." Thus, about a year before plaintiff left the company, DeSales "moved from this very basic way of creating the rundown to a more professional management rundown system" using production software. DeSales suggests that this change in systems undermines plaintiff's reliance on his responsibilities under the email system. Crucially, however, DeSales does not point to any facts indicating that the change in system led to a change in responsibilities. As Formica testified, the new system presented elements "in a different way with more information for everyone to access" but the "information conveyed would be similar." Therefore, the chance in systems does not create a genuine dispute of material fact as to plaintiff's responsibilities for "editing videos" and "creating graphics" over the course of plaintiff's employment with DeSales.

3

30 seconds each. They featured pages from Tablet with a voiceover. Another employee wrote the script, recorded the voiceover, and sent it to plaintiff. He then found the appropriate pages from Tablet and combined them with the voiceover and animations to create the promotion. According to DeSales's executive director of news content and development, this work entailed "mak[ing] animations around these pieces so that they pop out on the screen and . . . give people a sense of what the story looks like on paper." In sum, plaintiff received the script and the voiceover and "put[] the voice to the images."

Plaintiff's remaining job duties involved pitching news stories for Currents. He did so at the daily staff meetings, where DeSales encouraged employees to pitch stories based on their perspectives and experiences. The record does not contain any evidence that Currents aired a specific story that plaintiff pitched.

Throughout plaintiff's time as a Lead Video Editor and Graphic Artist, DeSales classified him as a "creative professional," exempt from overtime pay. DeSales tracked the number of hours he worked, and it occasionally exceeded 40 hours per week. After DeSales terminated his employment, plaintiff brought this suit under the FLSA and NYLL. He asserted overtime claims under both statutes, along with wage statement claims under the NYLL. Because the wage statement claims depend on plaintiff having a non-exempt status, the parties agree that these claims rise and fall with plaintiff's overtime claims.

## DISCUSSION

**I.   Whether Plaintiff Falls Within the Creative Professional Exemption**

Under the FLSA, an employer must pay overtime compensation for each hour that an employee works in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). The FLSA carves out several exemptions, including one for "any employee employed in a bona fide . . . professional capacity." § 213(a)(1). The statute does not define the term, see id., but the applicable

regulations set forth several types of professionals, see 29 C.F.R. § 541.300(a)(2)(ii), including "creative professionals," § 541.302. An employer has the burden of proving that an employee qualifies as a professional, and "because the FLSA is a remedial statute, this exemption must be narrowly construed." Young v. Cooper Cameron Corp., 586 F.3d 201, 204 (2d Cir. 2009) (quotation omitted). The NYLL contains an analogous exemption, see N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(iii)(a), and courts afford it the same reach as its federal counterpart, see, e.g., DeLuca v. Sirius XM Radio, Inc., No. 12-cv-8239, 2017 WL 3671038, at *26–27 (S.D.N.Y. Aug. 7, 2017).

To qualify as a "creative professional" under the federal regulations, "an employee's primary duty must be the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.302(a). These "recognized field[s]" include "the graphic arts." § 541.302(b). As for "invention, imagination, originality or talent," the regulations recognize that "[t]he duties of employees vary widely," such that "[d]etermination of exempt creative professional status . . . must be made on a case-by-case basis." § 541.302(c).[3]

As with any fact-intensive inquiry, "examples may be the best teachers." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001) (addressing a different issue). The regulations offer several examples:

> The requirement of "invention, imagination, originality or talent" . . . generally is met by actors, musicians, composers, conductors, and soloists; painters who at most are given the subject matter of their painting; cartoonists who are merely told the title or underlying concept of a cartoon and must rely on their own creative ability to express the concept; essayists, novelists, short-story writers and screen-play writers who choose their own subjects and hand in a finished piece of work to their employers (the majority of such persons are, of course, not

---

[3] The regulations also impose certain income requirements, but they are not at issue here. See 29 C.F.R. § 541.300(a)(2)(ii).

5

> employees but self-employed); and persons holding the more responsible writing positions in advertising agencies. This requirement generally is not met by a person who is employed as a copyist, as an "animator" of motion-picture cartoons, or as a retoucher of photographs, since such work is not properly described as creative in character.

29 C.F.R. § 541.302(c). In short, a court must distinguish "work requiring invention, imagination, originality or talent" from "work that primarily depends on intelligence, diligence and accuracy." § 541.302(a), (c).

Plaintiff's primary duties fell into the latter category. The record shows that plaintiff's primary duties were editing videos, creating graphics, and ensuring that the finished products met DeSales's production standards. Although this work can involve a great deal of invention, imagination, originality and talent, the regulations make clear that it is not the employee's general field that determines the employee's status – "what matters is what this particular employee's primary duties *actually were*." Kadden v. VisuaLex, LLC, 910 F. Supp. 2d 523, 538 (S.D.N.Y. 2012). And here, plaintiff's actual duties depended in large part on his ability to follow directions. In the rundown, he received step-by-step instructions that detailed the show down to the second. Thus, when plaintiff created graphics, edited videos, and ensured that the finished products met certain production standards, his job required more "intelligence, diligence and accuracy" than "invention, imagination, originality or talent." See id. (holding that a "litigation graphics consultant," who assisted attorneys in creating graphics for trials, did not fall within the exemption); cf. DeLuca, 2017 WL 3671038, at *26 (finding insufficient factual support to grant summary judgment to a defendant satellite radio provider where the plaintiff's work as an "imaging producer" involved "'creat[ing] the story' based on the instructions given by the programmer in the script").

Tellingly, defendants fail to identify *specific* tasks that prioritized imagination and creativity over intelligence and diligence. They instead paint in broad strokes. For instance,

6

defendants emphasize that plaintiff's work was "vital to the appearance and substance of Currents" and that plaintiff was a "key contributor to the daily production of Currents." Similarly, DeSales argues that plaintiff's job "required him to imagine and create original works by applying his skills in video editing and graphic arts."

These arguments share a common flaw: focusing on the finished product rather than the process by which it came about. Although "editing" a show may amount to "creating" a show in some instances, the editing here consisted of a series of discrete tasks that tell a somewhat different story. As DeSales's own memorandum explains, plaintiff's editing involved "fixing errors and gaps" and "changing and adding information." These are tasks of intelligence and diligence, not creativity. So while defendants cast plaintiff as akin to a painter who creates an original work, the record reveals it to be no more than a paint-by-numbers scheme. This type of work falls outside the exemption. See 29 C.F.R. § 541.302(c) (comparing "cartoonists who are merely told the title or underlying concept of a cartoon and must rely on their own creative ability to express the concept" with "'animator[s]' of motion-picture cartoons" who merely follow instructions). Therefore, plaintiff's editing videos, creating graphics, and ensuring that the finished products met DeSales's production standards did not cause him to fall within the exemption.[4]

---

[4] Although defendants rely on Freeman v. National Broadcasting Co., 80 F.3d 78 (2d Cir. 1996), my conclusion is not to the contrary. The bulk of that case addresses irrelevant issues of administrative law. As defendants emphasize, however, the Second Circuit also held that a writer, editor, producer, and field producer for NBC's "Nightly News" were creative professionals under a prior version of the regulations. Defendants focus on the field producer, named Robert Garner. The Second Circuit explained his duties:

> Garner covered news and feature stories . . . in the field, often with the assistance of a camera crew and, frequently, an on-air reporter. Garner would gather, develop, shoot, write, and edit news stories. He directed the camera crew and exercised his judgment as to who was to be interviewed, whether the interview was on-camera, the questions to be asked, and the visual elements to be videotaped. Garner exercised editorial control over the news stories he produced; he researched facts, developed story elements, interviewed subjects, wrote the script, and supervised the editing of the videotape. At the studio, Garner created segments suitable for airing on WNBC's local news program.

That leaves pitching stories and creating the style guide. Although these two tasks involved some creativity, they were not plaintiff's "primary duty" as the regulations require. 29 C.F.R. § 541.302(a). "The term 'primary duty' means the principal, main, major or most important duty that the employee performs," and "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." § 541.700(a). Here, plaintiff devoted a minimal part of his day to pitching stories, and to the extent he assisted in creating the style guide, it seems to have been a one-off task. These duties cannot bring plaintiff within the exemption.

I therefore hold that plaintiff falls outside the exemptions for creative professionals under the FLSA and NYLL. In doing so, I recognize that this is something of a close case. Some of plaintiff's job duties – especially creating graphics – inherently involve creativity. After all, the regulations list "graphic arts" as a "recognized field of artistic or creative endeavor," 29 C.F.R. § 541.302(b), and plaintiffs with similar qualifications and job titles have made "less than obvious candidate[s]" for overtime protections, Kadden, 910 F. Supp. 2d at 537–38. Further, plaintiff made over $75,000 a year – "hardly the kind of employee[] that the FLSA was intended to protect." Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 166 (2012); see also Kadden, 910 F. Supp. 2d at 538 (applying this logic to the exemption for creative professionals). At the end of the day, however, plaintiff's specific job duties do not qualify him for the exemption.

At the premotion conference, defendants acknowledged that if their motion for summary judgment failed, I could determine that plaintiff fell within the exemption as a matter of law, as

---

Id. at 81. Plaintiff had far less responsibility and discretion. He did not develop the stories that appeared on Currents, nor did he exercise any editorial control. Those were the jobs of his supervisors, and they instructed plaintiff how to carry out their vision for the newscast. That responsibility did not transform plaintiff into a creative professional.

the facts were largely undisputed. Indeed, what an employee's primary duties are is a question of fact, but whether those duties qualify the employee for an exemption is a question of law for the court. DeLuca, 2017 WL 3671038, at *27. My review of the record confirms that the disputes in this case involve the meaning and characterization of facts rather than the facts themselves. Therefore, I will grant plaintiff's cross-motion for partial summary judgment as it pertains to plaintiff's exempt status.[5]

## II.     Whether the Diocese Qualifies as Plaintiff's Employer

The FLSA's overtime provisions apply only to entities that qualify as an "employer." 29 U.S.C. § 207(a)(1). That term includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." § 203(d). "In identifying the persons or entities who qualify as 'employers' subject to this provision, statutory definitions sweep broadly." Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 140 (2d Cir. 2008). "The New York Labor Law also defines 'employee' broadly," so "[c]ourts applying both the FLSA and the New York Labor Law have concluded that the standards by which a court determines whether an entity is an 'employer' under the FLSA also govern that determination under the New York labor law." Hart v. Rick's Cabaret Int'l Inc., No. 09-cv-3043, 2010 WL 5297221, at *2 (S.D.N.Y. Dec. 20, 2010); see also N.Y. Lab. Law § 651(5) (defining "employee").

For this inquiry, "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (internal citation omitted) (quoting Goldberg v. Whitaker House Coop., 366 U.S. 28, 33 (1961)). "Under

---

[5] I cannot grant summary judgment "on liability," as plaintiff requests, for DeSales appears to dispute (1) whether plaintiff has established at this stage that he worked over 40 hours per week and (2) whether it "is an enterprise whose annual gross volume of sales made or business done is not less than $500,000" as the FLSA requires. 29 U.S.C. § 203(s)(1)(A)(ii).

9

the 'economic reality' test, the relevant factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quotations omitted). "These factors are not exhaustive and no single factor is determinative." Morangelli v. Chemed Corp., 922 F. Supp. 2d 278, 284 (E.D.N.Y. 2013).

Here, plaintiff relies on the so-called "single integrated enterprise" theory of employment. Derived from other employment contexts, this theory provides that an employee "who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005) (addressing Title VII claims). "The Second Circuit has never endorsed this theory of liability in the FLSA context, and district courts in this Circuit are divided on its application to FLSA and NYLL cases." Spiciarich v. Mexican Radio Corp., No. 14-cv-9009, 2015 WL 4191532, at *5 n.5 (S.D.N.Y. July 10, 2015) (collecting cases). Those that do apply it consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Morangelli, 922 F. Supp. 2d at 285 (quotation omitted).

Assuming that the theory could apply in the FLSA context, it would not apply here. The "central concern" is control of labor relations, id. (quotation omitted), and plaintiff offers scant evidence for this factor. Only DeSales paid plaintiff and provided his wage statements, tax statements, and exempt employee notices. Those notices indicated that they were prepared by

10

DeSales's assistant financial officer and its human resources manager, neither of whom were Diocese employees. Likewise, the individuals who supervised plaintiff's work, set his schedule, prepared his performance reviews, and approved his time off were not employees of the Diocese, but DeSales.

Taken together, these facts strongly suggest that DeSales and the Diocese were not a single integrated enterprise. See Benzinger v. Lukoil Pan Americas, LLC, 447 F. Supp. 3d 99, 134 (S.D.N.Y. 2020) (holding that two entities were not a single integrated enterprise where they had separate human resources departments); Morangelli, 922 F. Supp. 2d at 286 (holding that two entities were not a single integrated enterprise where one did not control the plaintiffs' work schedules and employment conditions); see also Juarez v. 449 Rest., Inc., 29 F. Supp. 3d 363, 368 (S.D.N.Y. 2014) (holding that the plaintiff had plausibly alleged that entities were a single integrated enterprise where employees worked across multiple locations and the owner employed common hiring and payment practices).

Plaintiff also fails to show interrelated operations. For this factor, courts consider, among other facts, whether the entities "share employees, services, records, and equipment" and whether the entities "commingle bank accounts, inventories, and lines of credit." Geraci v. Rest. at Apple Greens, Inc., No. 1:16-cv-1385, 2019 WL 1386318, at *14 (N.D.N.Y. March 27, 2019). The record contains no evidence that DeSales and the Diocese have comingled their operations in these respects. Plaintiff instead emphasizes that the Diocese owns DeSales's office space and that, as a DeSales employee, he enrolled in the Diocese's Lay Employee Pension Plan and its New York Group Medical Insurance Trust. But the fact that one entity is the other's landlord "do[es] not suggest the lack of an arm's-length relationship between the two entities." Id. And common benefits plans do not establish a single integrated enterprise, either. See Morangelli,

11

922 F. Supp. 2d at 286; see also Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 405 (S.D.N.Y. 1999) (noting in the Title VII context that "a common benefits package speaks only to economies of scale").

In the end, plaintiff is left with allegations of common management and ownership. As he notes, DeSales and the Diocese share a single employee, Monsignor Kieran Harrington, who serves as the Diocese's Vicar of Communications and DeSales's President, CEO, and Chairman of the Board. Additionally, DeSales's bylaws provide for three "members": the Bishop of the Roman Catholic Diocese of Brooklyn and two "members of the clergy" who are designated by and serve at the pleasure of the Bishop. These members exercise various corporate powers, such as "approv[ing] any change in the philosophy and/or mission of the corporation" and appointing the board of directors, the president, and the CEO. According to plaintiff, these formal connections led to functional ones as well. DeSales distributes its publications on behalf of the Diocese, and the Diocese accounts for nearly 70 percent of DeSales's revenue. The Diocese has also referred to DeSales as its "communications and technology arm." Thus, says plaintiff, the two should be treated as one.

Although this close relationship suggests the existence of a single integrated enterprise, it cannot overcome the remaining evidence in the record. "[C]ommon ownership and common purpose, without more, do not answer the fundamental question of whether each corporate entity controlled [the plaintiffs] as employees." Huang v. Shanghai City Corp., 459 F. Supp. 3d 580, 588 (S.D.N.Y. 2020). This is so because "[t]he law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances, just as the law only pierces the veil of a corporate entity under extraordinary circumstances." Fenner v. News Corp., No. 09-cv-9832, 2013 WL 6244156, at *9 (S.D.N.Y. Dec. 2, 2013) (quotation omitted). "The

presumption is that 'corporate personalities remain distinct' and 'that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership.'" Id. at *11 (quoting United States v. Bestfoods, 524 U.S. 51, 69 (1998)). Although DeSales is not technically the Diocese's subsidiary, the logic behind that principle applies with equal force in this case. As in other cases, therefore, "common ownership and a common business plan and purpose" are not enough to establish a single integrated enterprise. Apolinar v. R.J. 49 Rest., LLC, No. 15-cv-8655, 2016 WL 2903278, at *4 (S.D.N.Y. May 18, 2016).

Having considered the economic reality under the totality of the circumstances, I conclude that the Diocese did not qualify as plaintiff's employer.

## CONCLUSION

For the foregoing reasons, DeSales's motion for summary judgment [31] is denied, the Diocese's motion for summary judgment [30] is granted, and plaintiff's cross-motions for summary judgment [35] and [38] are granted in part and denied in part. The Clerk is directed to terminate the Diocese as a party to this action.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
April 1, 2021